# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| v. | § | Case Number: 3:24-CR-00437-M |
| | § | |
| LEDARION MARSELLE HICKS, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss Indictment filed by Defendant Ledarion Marselle Hicks. (ECF No. 15). For the reasons stated below, the Motion is **DENIED**.

## I.     Background

On October 16, 2024, Defendant was charged with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). At the time Defendant is alleged to have been in possession of a firearm, Defendant had prior convictions for (1) aggravated assault resulting in serious bodily injury in violation of Texas Penal Code § 22.02, (2) assault involving family violence by impeding breathing and circulation in violation of Texas Penal Code § 22.01, and (3) forgery of a government instrument in violation of Texas Penal Code § 32.21. (ECF No. 15, p. 8).[1] 18 U.S.C. § 922(g)(1) states, in relevant part: "It shall be unlawful for any person who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce[] any

---

[1] *See State v. Hicks*, No. F-1600640-V (292nd Dist. Ct., Dallas County, Tex. Dec. 5, 2017); *State v. Hicks*, F-1776036-V (292nd Dist. Ct., Dallas County, Tex. Dec. 5, 2017); and *State v. Hicks*, F-1441644-V (292nd Dist. Ct., Dallas County, Tex. Dec. 5, 2017).

firearm or ammunition . . . ." Each of the convictions cited above are punishable by imprisonment for a term exceeding one year. *See* Texas Penal Code §§ 22.01, 22.02, and 32.21.

Defendant argues that this Court should dismiss his indictment because § 922(g)(1) violates the Second Amendment to the United States Constitution, both facially and as applied, and because § 922(g)(1) exceeds Congress's power under the Commerce Clause.

## II.     Legal Standard

Federal Rule of Criminal Procedure 12(b)(1) permits a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." "A court may grant a motion to dismiss an indictment if the defect is essentially a question of law." *United States v. Martinez*, 3:24-CR-148-L, 2024 WL 4508962, at *1 (N.D. Tex. Oct. 16, 2024) (citing *United States v. Banks*, 339 F.3d 267, 269 (5th Cir. 2003)). "Motions to dismiss that test the interpretation of a statute are such questions of law that are proper for the court to review." *Id.* (citation omitted) (reviewing the constitutionality of § 922(g)(1) under the Second Amendment and Commerce Clause). *See also United States v. Mack*, NO. 3:24-CR-00244, 2025 WL 221808, at *1 (W.D. La. Jan. 16, 2025) ("A court may resolve such defects before trial when the motion presents a question of law." (citation omitted)).

As-applied challenges require a defendant to establish that "the application of the challenged statute to the facts of his case would violate his constitutional rights." *United States v. Simien*, 655 F. Supp. 3d 540, 548 (W.D. Tex. 2023) (citing *United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022)). Facial challenges, which are the "'most difficult challenge to mount successfully,'" require a defendant to establish that there is no set of circumstances under which the challenged act or law would be valid. *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). As-applied challenges are

2

considered first because they are the narrower consideration. *Buchanan v. Alexander*, 919 F.3d 847, 852 (5th Cir. 2019) (citation omitted).

### III. Defendant's Second Amendment Challenges

#### A. As-Applied Challenge

##### 1. Standards

In *United States v. Diaz*, the Fifth Circuit found that *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), rendered its Second Amendment precedent obsolete. 116 F.4th 458, 465 (5th Cir. 2024). Accordingly, to determine the validity of Hicks's as-applied challenge, this Court must examine whether § 922(g)(1), as applied to him, comports with *Bruen*.

Under *Bruen*, courts first consider whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24.[2] If the individual's conduct is covered, then the "Constitution presumptively protects that conduct." *Id.* If the conduct is presumptively protected, then the "government must . . . justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*[3]

To determine whether the regulation is consistent with the Nation's historical tradition of firearm regulation, courts must determine whether there is a "well-established and representative historical *analogue*" to the law in question. *Id.* at 30 (emphasis in original). This analogue need not be a "historical *twin*." *Id.* (emphasis in original). *See also id.* ("[E]ven if a modern-day

---

[2] The Second Amendment provides: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

[3] This two-step framework is "effectively collapsed into one question: whether the law is consistent with our Nation's history of firearm regulation." *Diaz*, 116 F.4th at 467 (citing *Rahimi*, 144 S. Ct. at 1898).

regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."). The historical analogue, however, must be "'relevantly similar' to the challenged law." *Martinez*, *supra*, at *3 (quoting *Bruen*, 597 U.S. at 29). *See also United States v. Contreras*, 125 F.4th 725, 731 (5th Cir. 2025) ("[T]he *Bruen* inquiry, as articulated in *Diaz*, requires not only showing that someone convicted of any felony was punished in a comparable way but that someone convicted of an *analogous felony* was punished in a comparable way." (emphasis added) (citing *Diaz*, 116 F.4th at 467)); *id.* ("Simply classifying a crime as a felony does not meet the level of historical rigor required by *Bruen* and its progeny. To meet its burden, then, the Government's evidence must be more specifically targeted." (citation and quotation marks omitted)). In the context of § 922(g)(1), this Court "may consider laws regulating [felons], even if they are not explicitly related to firearms," because § 922(g)(1) "focuses on a specific group of people." *Diaz*, 116 F.4th at 468.

The mandated inquiry requires courts to examine the "*central* considerations" of "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Contreras*, 125 F.4th at 729 (emphasis in original) (citation and quotation marks omitted). *See also Rahimi*, 144 S. Ct. at 1889 (noting that "[w]hy and how the regulation burdens the right are central to th[e] inquiry" of "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition" (citation omitted)); *United States v. Giglio*, 126 F.4th 1039, 1043 (5th Cir. 2025) ("'The challenged and historical laws . . . must both (1) address a comparable problem (the 'why') and (2) place a comparable burden on the right holder (the 'how').'" (quoting *United States v. Daniels*, 124 F.4th 967, 973 (5th Cir. 2025))).

## 2. Applying the Standards to Hicks

Applying these standards to this case, the "plain text of the Second Amendment covers the conduct prohibited by § 922(g)(1)." *Diaz*, 116 F.4th at 467.  The government, therefore, bears the burden of identifying a requisite historical analogue.  *See Bruen*, 596 U.S. at 30.

To determine whether the government has identified such an analogue, this Court considers Hicks's predicate convictions described above, each of which is punishable by imprisonment for a term exceeding one year.  *See Diaz*, 116 F.4th at 467.  Predicate offenses cannot be "charges that were dismissed, that were not punishable by a term of more than one year, or that were charged in the same indictment as the § 922(g)(1) charge." *United States v. Barfield*, NO. 2:24-CR-00007-01, 2024 WL 4859094, at *1 (W.D. La. Nov. 21, 2024) (citation omitted).  *See also Giglio*, 126 F.4th at 1046.

The government contends for two reasons that Hicks's predicate offenses establish that § 922(g)(1) is constitutional as applied to him:  first, "[d]isarming Hicks is consistent with this Nation's history of severely punishing those convicted of counterfeiting currency," and second, "[d]isarming Hicks is . . . consistent with the government's ability to disarm dangerous felons." (ECF No. 17, pp. 6, 9).

### a. Counterfeiting and Forgery

Hicks contends that his forgery conviction cannot support a constitutional application of § 922(g)(1) to him, because historical laws addressing counterfeiting and forgery imposed only a punishment of a term of years, not forfeiture of property or death.  The government responds by directing the Court to historical federal and state laws, including at the time of the Founding, that severely and permanently punished those who forged or counterfeited certain documents and instruments.

5

One piece of historical evidence to which the government points the Court in an attempt to carry its burden is a federal law enacted in 1790 that imposed death on those who "falsely ma[d]e, alter[ed], forge[d] or counterfeit[ed]" "any certificate, indent, or other public security of the United States" "with intention to defraud" and with knowledge of the instrument's illegitimacy.  An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 115, Sec. 14 (1790).  The government also directs the Court to New York laws that imposed death and forfeiture of land and personal property on those convicted of various crimes, including counterfeiting.  2 Laws of the State of New York Passed at the Sessions of the Legislature 260–61, 664–66 (1886).

Similarly, the government highlights a Vermont law that forced individuals convicted of counterfeiting to forfeit "all the[ir] estate."  Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Calif. L. Rev. 277, 332 n.275 (2014) (citing 1779 Vt. Acts & Resolves 93–96).  As pointed out by the government, Virginia, Maryland, and Rhode Island severely and permanently punished those who were convicted of forgery or counterfeiting.  *See* 9 William Waller Hening, Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature 302–03 (1821); 1 The Laws of Maryland[,] With the Charter, The Bill of Rights, the Constitution of the State, and its Alterations, the Declaration of Independence, and the Constitution of the United States, and its Amendments 79 (1811); Acts and Laws of The English Colony of Rhode Island and Providence-Plantations in New-England in America 33–34 (1767).[4]

---

[4] Other courts have also recognized the wide range of historical laws that imposed death and property forfeiture on those who counterfeited or forged certain instruments.  *See, e.g.*, *United States v. Wilson*, No. 22-238, 2024 WL 4436637, at *4  (E.D. La. Oct. 6, 2024) ("States and the federal government authorized imposition of the death penalty for the counterfeiting and forgery of public securities."); *United States v. Garner*, NO. 5:24-00112-01, 2024 WL 4820794, at *3 (W.D. La. Nov. 18, 2024) ("Acts such as . . . making or trading counterfeit or forged securities constituted capital crimes punishable by death." (citation omitted)); *Contreras*, 125 F.4th at 731

6

Before examining the relationship between these historical sources and § 922(g)(1) as applied to Hicks, the Court first notes that the foregoing evidence is specifically targeted to Hicks's circumstances: these historical laws regulating counterfeiting and forgery are sufficiently analogous to Hicks's predicate conviction for forgery. *Cf. Diaz*, 116 F.4th at 468 (finding that historical laws concerning horse theft "correspond[ed]" to the predicate felony of car theft); *Contreras*, 125 F.4th at 731 (considering historical laws surrounding intoxication via alcohol as sufficiently analogous to the predicate facts of "an unlawful user of a controlled substance [cannabis]" "knowingly possess[ing] a firearm" (citation and quotation marks omitted)). The government, therefore, does not rely solely on Hicks's status as a felon to meet its burden. *See Diaz*, 116 F.4th at 468 ("The fact that [Hicks] is a felon today, then, does not necessarily mean that he would have been one in the 18th century. However, the government's evidence is more specifically targeted to [Hicks's] circumstances.").

Turning to the "how," the punishment imposed by § 922(g)(1), permanent disarmament, is not greater than the punishment prescribed in the government's specifically targeted historical evidence, death or property forfeiture. The historical and modern regulations, as a result, impose a comparable burden. *See id.* at 469 ("[I]f capital punishment was permissible to respond to theft, then the lesser restriction of permanent disarmament that § 922(g)(1) imposes is also permissible."); *see also Mack*, *supra*, at *3 ("[I]f a death sentence was permissible to respond to possessing contraband, then the lesser restriction of permanent disarmament that § 922(g)(1)

---

(citing historical sources showing that counterfeiting was punishable in certain jurisdictions by death or property forfeiture); *United States v. Quiroz*, 125 F.4th 713, 719–20 (5th Cir. 2025) ("Between 1790 and 1805, Georgia sentenced individuals to death for crimes such as murder, *forgery*, and horse-stealing." (emphasis added) (citation omitted)). *See also United States v. Bell*, No. 23 CR 311, 2023 WL 8475814, at *5 (N.D. Ill. Dec. 7, 2023) (compiling historical laws imposing capital punishment and estate forfeiture as the punishments for forgery, counterfeiting, and similar crimes).

imposes is also permissible." (citation and quotation marks omitted)); *Martinez*, *supra*, at *4 ("Permanent disarmament under § 922(g)(1) does not punish individuals 'to the extent beyond what was done at the founding.'" (quoting *Rahimi*, 144 S. Ct. at 1898)); *United States v. Walton*, NO: 24-66, 2025 WL 259370, at *6 (E.D. La. Jan. 17, 2025) (considering "the logic of *Diaz* that disarmament of a felon is less severe than capital punishment, while both are still permanent," before rejecting the defendant's as-applied challenge).

      The justifications behind these similar burdens are also comparable. The historical laws discussed above were enacted to deter crime and protect society from those who could not follow the law. *See, e.g.*, *Diaz*, 116 F.4th at 469 ("The purpose of capital punishment in colonial America was threefold: deterrence, retribution, and penitence." (citation omitted)); *Barfield*, *supra*, at *2 (quoting *Diaz* for the proposition that "laws authorizing capital punishment and estate forfeiture were 'justified by the need to adequately punish felons, deter reoffending, and protect society from those unproven untrustworthy to follow the law'"). The same is true for § 922(g)(1). *See Diaz*, 116 F.4th at 469 ("The justification for § 922(g)(1) is . . . to deter violence and lawlessness."); *Martinez*, *supra*, at *4 ("[T]he justification for § 922(g)(1) is to deter violent individuals from possessing a firearm and *ensure law and order*." (emphasis added)); *id.* ("[T]he 'why' of [the laws the court analyzed, which include some of the historical laws discussed herein,] was to protect society, punish offenders and deter repeated offenders."); *Huddleston v. United States*, 415 U.S. 814, 824 (1974) ("The principal purpose of the federal gun control legislation, therefore, was to curb crime by keeping firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency." (citation and quotation marks omitted)).

Because the modern and historical regulations impose comparable burdens that are comparably justified, disarming Hicks is consistent with this Nation's history of severely punishing those convicted of counterfeiting and forgery. The government, therefore, has satisfied its burden to show that § 922(g)(1) as applied to Hicks is consistent with the Nation's historical tradition of firearm regulation.

      b. <u>Dangerous Felons</u>

The Court could end its analysis of Hicks's as-applied challenge here because the government has shown that at least one of Hicks's predicate offenses has a requisite historical analogue and that, as a result, § 922(g)(1) is constitutional as applied to him. The Court, however, also considers the parties' arguments concerning the assault convictions.

Hicks argues that his assault charges do not support a constitutional application of § 922(g)(1) to him because assault and assault-like offenses were punished historically only by a term of imprisonment, not death or property forfeiture. The government responds that Hicks's assault charges establish that he is a dangerous person and that dangerous individuals can be constitutionally disarmed under § 922(g)(1). The government cites a range of historical sources to support its position.

The government cites evidence concerning "going armed" laws, or historical laws that required those who used arms to menace others to forfeit their arms on the ground that they disrupted the public order and caused violence. *See, e.g.*, 4 W. Blackstone, Commentaries on the Laws of England 148–49 (1st ed. 1769); 1 Acts and Resolves of the Providence of Massachusetts Bay 52–53 (1869), Act of Nov. 1, 1692, ch. 18, § 6. *See also Rahimi*, 144 S. Ct. at 1901 ("[T]he going armed laws prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land." (citation and quotation marks omitted)). Indeed, the Fifth

9

Circuit recently confirmed, while citing some of the same pieces of historical evidence that the government cites here, that "[g]oing armed laws are relevant historical analogues to § 922(g)(1)." *Diaz*, 116 F.4th at 471 (finding that "both [going armed laws and § 922(g)(1)] provide for permanent arms forfeiture as penalty" and "[i]mposing permanent disarmament as a punishment is . . . within our Nation's history and tradition").[5]

The government also points to historical sources indicating that the people at the time the Second Amendment was ratified understood that the right to bear arms was not infinite and recognized that people had the right to bear arms "unless for crimes committed, or real danger of public injury." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971). *See also id.* at 681 (describing a proposed amendment that would have prohibited Congress from preventing "the people of the United States, *who are peaceable citizens*, from keeping their own arms" (emphasis added)); *Diaz*, 116 F.4th at 470 (relying on Schwartz, *supra*, because it helped illuminate the common understanding of the Second Amendment at the time of its ratification). Similarly, the government cites historical evidence detailing that some laws employed case by case analyses to determine whether someone could be forced to forfeit his arms on the ground that he was dangerous. *See, e.g.*, 1777 N.J. Laws 90, ch. 40 § 20 (Sept. 1777) (allowing officials

---

[5] Because the Fifth Circuit has found that going armed laws are historical analogues to § 922(g)(1), Hicks's argument that this Court should find that his assault convictions do not support the application of § 922(g)(1) to him because assault and assault-like charges were punished historically only with a term of years of imprisonment is rejected on the ground that it is too narrow; this Court can consider other similar historical sources, even if they do not pertain directly to assault or assault-like offenses. In fact, going armed laws are more analogous to the facts of this case than they were to those in *Diaz*. In *Diaz*, the Fifth Circuit conceded that "the justification behind going armed laws—to 'mitigate demonstrated threats of physical violence'—does not necessarily support a tradition of disarming Diaz, whose underlying convictions do not inherently involve a threat of violence." *Diaz*, 116 F.4th at 471 n.5. On the other hand, Hicks's assault convictions involve threats of physical violence, aligning the justifications for going armed laws and § 922(g)(1) as applied to Hicks.

"to deprive and take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").

The historical evidence the government cites confirms what other courts, including the Supreme Court, have made clear: "When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Rahimi*, 144 S. Ct. at 1901.[6] This Court, therefore, considers whether Hicks poses a clear threat to the physical safety of others, as if he does, then he can be constitutionally disarmed.

Hicks's predicate convictions for aggravated assault resulting in serious bodily injury in violation of Texas Penal Code § 22.02 and assault involving family violence by impeding breathing and circulation in violation of Texas Penal Code § 22.01 establish that he poses a clear threat to the physical safety of others. *Accord Matthews*, *supra*, at *3 ("[T]he government may restrict firearm[s] access to those convicted of robbery because inherent in a robbery conviction is posing a threat to the physical safety of others.").

For the foregoing reasons, Defendant's predicate convictions for assault support his permanent disarmament under § 922(g)(1). *See Rahimi*, 144 S. Ct. at 1901; *supra* n.6.

Defendant's as-applied challenge fails.

---

[6] *See also Mack*, *supra*, at *2 ("[T]he historical examples discussed in *Rahimi* and *Diaz* are all rooted in a common purpose: the disarming of individuals that may pose a risk of violence or otherwise threaten public safety." (citing *Diaz*, 116 F.4th at 469)); *United States v. Bullock*, 123 F.4th 183, 185 (5th Cir. 2024) ("The historical record demonstrates 'that legislatures have the power to prohibit dangerous people from possessing guns.'" (quoting *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting))); *United States v. Matthews*, NO. 24-114, 2025 WL 105291, at *3 (E.D. La. Jan. 15, 2025); *United States v. Frazier*, NO. 24-cr-00093, 2024 WL 5113496, at *2 (W.D. La. Dec. 12, 2024); *United States v. Barber*, NO. 3:24-CR-00152, 2024 WL 4828735, at *4 (W.D. La. Nov. 19, 2024); *Martinez*, *supra*, at *3–*4.

### B. Facial Challenge

Defendant concedes that *Diaz* forecloses his argument that § 922(g)(1) is facially unconstitutional. 116 F.4th at 471–72. *See also Contreras*, 125 F.4th at 727; *Martinez*, *supra*, at *4. Defendant's argument is therefore rejected.[7]

## IV. Defendant's Commerce Clause Challenge

Defendant's argument that § 922(g)(1) exceeds Congress's power under the Commerce Clause is foreclosed by binding precedent. *Diaz*, 116 F.4th at 462. *See also Matthews*, *supra*, at *4; *Martinez*, *supra*, at *5. Defendant's Commerce Clause challenge is accordingly rejected.[8]

## V. Conclusion

For the reasons stated above, Defendant's Motion to Dismiss Indictment is **DENIED**.

**SO ORDERED**.

March 18, 2025.

*[signature]*
BARBARA M. G. LYNN
SENIOR UNITED STATES DISTRICT JUDGE

---

[7] Defendant's facial challenge based on the Second Amendment is also rejected on the ground that § 922(g)(1) is constitutional as applied to him. *See, e.g.*, *Diaz*, 116 F.4th at 471–72.

[8] Defendant "does not agree" with the common understanding of § 922(g)(1)'s possession prong, contending that "'possess in or affecting commerce' means something other than the object passed across a state or international boundary at some point in the past." (ECF No. 15, p. 4; p. 4 n.1). Defendant, however, "concedes that courts have thus far rejected . . . th[is] statutory argument." (ECF No. 15, p. 4 (emphasis omitted)). To the extent Defendant asks this Court to adopt his preferred reading of § 922(g)(1), that request is denied.